**FILED**

JUL 16 2007

Jul. 16, 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

*JH*

07CV3984

**JUDGE KENDALL
MAG. JUDGE NOLAN**

LEONARD BRONSTEIN, on behalf of
himself and derivatively on behalf of
Abbott Laboratories,

        Plaintiff,

        v.

ROXANNE S. AUSTIN, WILLIAM M. DALEY,
W. JAMES FARRELL, H. LAURANCE
FULLER, RICHARD A. GONZALEZ,
THE RT. HON. LORD OWEN CH, BOONE
POWELL, JR., W. ANN REYNOLDS, PH.D.,
ROY S. ROBERTS, SAMUEL C. SCOTT, III,
WILLIAM D. SMITHBURG, GLENN F.
TILTON and MILES D. WHITE,

        Defendants,

    and

ABBOTT LABORATORIES,
a Corporation,

        Nominal Defendant

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

(Shareholder Derivative Action)

JURY TRIAL DEMANDED

VERIFIED DERIVATIVE
COMPLAINT FOR BREACH
OF FIDUCIARY DUTY

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, by and through his undersigned counsel, on personal knowledge as to himself and his own acts and information and belief as to all other matters based upon an investigation by plaintiff's counsel alleges for his derivative complaint as follows:

## JURISDICTION AND VENUE

1.      This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

2.      Plaintiff is a citizen of Delaware.  None of the defendants is a citizen of Delaware. The nominal defendant, Abbott Laboratories ("Abbott" or "the Company"), is an Illinois corporation and its executive offices are located in this District.  The amount in controversy exceeds $75,000, exclusive interest and costs.  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.

3.      This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Abbott is headquartered in this district and the Company and the defendants are subject to personal jurisdiction in this district.  Venue is proper in this district because some or all of the events, actions and failures to act giving rise to the claims asserted herein occurred in this district.

## THE PARTIES

4.      Plaintiff is a current shareholder and has continuously held Abbott stock throughout the relevant period alleged herein to the present.

## DEFENDANTS

5.      Miles D. White ("White") is and has been the Chairman of Abbott's Board of Directors Abbott's Chief Executive Officer since 1999. Before that time, White had been head of Abbott's Diagnostic Division.

6.      Roxanne S. Austin ("Austin") is a Director of Abbott and has been a Director since 2000. Defendant Austin serves as a member of the Public Policy Committee of the Abbott Board.

7.      William M. Daley ("Daley") is a Director of Abbott and has been a Director since 2004. Defendant Daley serves as a member of the Public Policy Committee of the Abbott Board.

8.      W. James Farrell ("Farrell") is a Director of Abbott and has been a Director since 2006.

9.      H. Laurance Fuller ("Fuller") is a Director of Abbott and has been a Director since1988.

10.     Richard A. Gonzalez ("Gonzalez") is a Director of Abbott and has been a Director since 2001. Defendant Gonzalez has been the President and Chief Operating Officer of Abbott since 2006. Gonzalez has worked for Abbott since 1977.

11.     David Owen ("Owen") is a Director of Abbott and has been a Director since 1996.

12.     Boone Powell, Jr. ("Powell") is a Director of Abbott and has been a Director since 1985. Defendant Powell serves as a member of the Public Policy Committee of the Abbott Board.

13.     W. Anne Reynolds ("Reynolds") is a Director of Abbott and has been a Director since 1980. Defendant Reynolds serves as a member of the Public Policy Committee of the Abbott Board.

14.     Roy S. Roberts, Ph.D. ("Roberts") is a Director of Abbott and has been a Director since 1998. Defendant Roberts serves as a member of the Public Policy Committee of the Abbott Board.

15.     Samuel C. Scott ("Scott") is a Director of Abbott, elected in 2007.

3

16.    William D. Smithburg ("Smithburg") is a Director of Abbott and has been a Director since 1982.

17.    Glenn F. Tilton ("Tilton") is a Director of Abbott, elected in 2007.

18.    Because of their membership on the Abbott Board, and its various committees and the specific procedures that were included in the Public Policy Committee Charter ("the Public Policy Committee Charter," attached hereto as Exhibit "A"), defendants, pursuant to Illinois law, owed the Company and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to oversee and control the operations and business of Abbott in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Abbott and its stockholders. In addition, while they occupied their directorship, defendants owed Abbott the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets.

19.    To discharge the aforesaid duties under Illinois law, defendants were required to exercise reasonable and prudent supervision over management and the policies, practices, controls and financial affairs of the Company pursuant to their fiduciary obligations and the Company's own charters, and to use the same care and diligence as would an ordinary prudent person in a like position. The Public Policy Committee Charter of the Public Policy Committee of the Abbott Board ("the Committee") specifically provided that, inter alia, one of the specific enumerated purposes of the Committee was to "assist the Board in fulfilling its oversight responsibility" with respect to regulation by the Federal Food and Drug Administration ("the FDA") of Abbott's businesses. The Public Policy Committee Charter provided specifically that the Committee shall, inter alia, review and

4

evaluate Abbott's policies and practices with respect to maintaining regulatory compliance, and devise a process for dissemination of information to the Committee from management with respect to regulatory compliance matters, including presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto.

20.     Thus, to exercise reasonable control, oversight and supervision, defendants and Abbott had established a scheme pursuant to which the Board of Directors of Abbott would remain informed as to the status of Abbott's regulatory compliance, including regulatory compliance by the Abbott Diagnostic Division with all applicable FDA regulations. And would be fully able to intervene timely to assure that adequate measures were taken by management to resolve effectively any issues of regulatory compliance with applicable FDA regulations.

21.     Defendants had access to adverse non-public information about the FDA regulatory problems of noncompliance that were plaguing Abbott's Diagnostic Division, including the receipt of the March 13, 2007 Warning Letter from the FDA addressed to defendant White, as Chairman of the Board of Abbott ("the Warning Letter," attached hereto as Exhibit "B").     The Warning Letter, *inter alia*, described the history of the problems of regulatory noncompliance in the Abbott Diagnostic Division, involving violations of Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) at Abbott's Irving, Texas, facility.

5

## NOMINAL DEFENDANT

22.     Nominal defendant, Abbott, is a global-based-health-care company. One of its four business segments is the Abbott Diagnostics Division. Abbot's Diagnostic Division contributed $4 billion in revenues and $431 million in operating profit in 2006.

### COUNT I

### Against All Defendants for
### Breach of Fiduciary Duty

23.     On January 18, 2007, Abbott issued a press release announcing the sale of its core laboratory diagnostics business, including Abbott Point of Care to General Electric Company for $8.13 billion in cash. The business being sold comprised all of the Abbott Diagnostic Division, except for Abbott's Molecular Diagnostics and Diabetes Care businesses. In the press release, White stated that "[t]he laboratory diagnostics market has changed considerably in the last decade. Innovation in this segment will be increasingly driven by automation, system integration and a host of skills that GE can offer. As part of GE, Abbott's core diagnostics and point-of-care business will be powerfully positioned to sustain and extend their market success." The press release further stated that the sale was expected to close in the first half of 2007 and was subject to "customary closing conditions," which would include regulatory approval and due diligence of the diagnostic business by GE.

24.     At and prior to the time Abbott entered into the contract with GE to sell the core diagnostics business to GE for $8.13 billion in cash, defendants knew of the serious, long-standing FDA regulatory problems that were plaguing the Irving, Texas facility of the Diagnostic Division's operations. Defendants knew that Abbott had been receiving a series

6

of FDA Forms 483 in which the FDA documented the regulatory noncompliance of the Irving, Texas, facility. Defendants also knew that the noncompliance with the CGMP of the QS were continuing and that Abbott management had not taken appropriate steps to cure the failures and to bring the Irving, Texas, facility into compliance with CGMP.

25.    Less than two months after Abbott signed the sales contract with GE, defendants received the Warning Letter from the FDA which, *inter alia*, advised them that failure to take prompt action to bring the facility into compliance could result in FDA regulatory action including, *inter alia*, seizure, injunction and/or civil penalties and could affect awards of contracts and pre-market approval applications for Class III devices. Defendants did not publicly disclose the Warning Letter or the adverse impact it would have on the sale of Abbott's core diagnostic division to GE. Defendants knew the serious nature of these consequences because, *inter alia*, Abbott, in December 1999 had paid $100 million in civil penalties, the largest civil penalty ever, to the United States for failure to bring its Diagnostic Division into compliance with FDA regulations including current good manufacturing practice. Additionally, Abbott was required to take certain measures to comply with FDA regulations, including but not limited to conducting regular audits of its operations and make reports to the FDA. The press release issued by the United States Department of Justice concerning Abbott's noncompliance with FDA regulations and the payment of that penalty, and related consequences, is attached hereto as Exhibit "C."

26.    Because of defendants' repeated failure to act reasonably to address the deficiencies recited by the FDA in the FDA Forms 483 and Warning Letter, defendants put at serious risk the closing of the sale of Abbott's core diagnostic business to GE. The sale of the core diagnostics business was a principal part of Abbott's operating plan and was

7

made in connection with Abbott's acquisition of several new multi-billion businesses. Thus, Abbott had positioned itself to go forward without the core diagnostic business and had made strategic acquisitions and realignments of its operations. In addition, pursuant to generally accepted accounting principles, Abbott no longer reported the results of the core diagnostic business in Continuing Operations. Rather they were reported as Discontinued Operations pending divestiture.

27.     Suddenly, on July 11, 2007, Abbott issued a terse statement that GE and Abbott had terminated the sales contract of Abbott's core diagnostic business because they were unable to agree on "final terms and conditions."

28.     The securities analysts' reactions focused on Abbott's regulatory problems with the FDA in its diagnostic business and particularly on the Warning Letter as a principal reason why GE was able to walk away from the $8.13 billion deal without paying a customary break-up fee to Abbott. One analyst said that in talking to Abbott it appeared that GE had asked for additional terms that would have decreased the value of the transaction and commented that GE's ability to walk away from the deal without paying a breakup fee strongly suggests that GE had a strong case to either renegotiate or terminate the contract.

29.     Defendants owed to Abbott the highest duties of loyalty, honesty, diligence and fairness in conducting the Company's affairs in a lawful manner. The defendants knowingly or with gross recklessness breached their fiduciary duties by orchestrating, devising, carrying out, participating in and/or failing to prevent, terminate, or timely correct the wrongdoing alleged herein.

30.    Defendants willingly, knowingly and with gross recklessness allowed Abbott to continue, despite several warnings from the FDA, to operate in noncompliance with FDA regulations.

31.    As a direct and proximate result of the defendants' violations of their fiduciary duties, Abbott has been injured. Abbott will not be able to close on the sale of its core diagnostic business to GE. In addition, Abbott faces severe regulatory consequences form its failure to bring the Irving, Texas facility into compliance with FDA CGMP and QS regulations. The exact amount of Abbott's total damages are not presently determinable.

32.    Plaintiff brings this action as a current shareholder of Abbott on behalf of Abbott to obtain indemnification for all damages suffered by Abbott and a judicial determination that each of the defendants is obligated to indemnify and hold Abbott harmless from any and all such damages. Further, plaintiff, on behalf of Abbott, seeks recovery of all damages suffered by Abbott as a result of defendants' breaches of duty.

## DERIVATIVE ALLEGATIONS

33.    Plaintiff brings this action derivatively in the right and for the benefit of Abbott to redress injuries suffered and to be suffered by Abbott as a direct result of the breaches of fiduciary duty and violations of laws alleged herein. Plaintiff will adequately and fairly represent the interests of Abbott and its shareholders in enforcing and prosecuting their rights.

34.    Plaintiff has not made any demand on the Board to institute this action. Demand is excused here because it would be a futile and useless act.

35.    As alleged herein above, defendants, by their actions and inaction, have subjected themselves to personal liability for the wrongdoing alleged herein. Defendants

9

knew of the regulatory noncompliance at the Irving, Texas, facility of the Abbott Diagnostics Division or were reckless in their disregard of the information presented to them through, *inter alia*, the Public Policy Committee and the FDA Warning Letter. The historical acts of regulatory noncompliance described in the Warning Letter were known to or recklessly disregarded by defendants contemporaneously by reason of, *inter alia*, the functioning of the Public Policy Committee and its conduct pursuant to and in conformity with the Public Policy Committee Charter. By engaging in a course of conduct over a significant period of time pursuant to which defendants, with knowledge of the wrongful acts of noncompliance with FDA regulations and notice from the FDA of that regulatory noncompliance, took no steps to right the wrongful conduct and bring the Irving, Texas, facility into compliance with applicable FDA regulations acted with a lack of good faith.

36. Defendants' conduct, under such circumstances, is a violation of their fiduciary duty and is not protected by business judgment, Illinois law or any provision in Abbott's articles of incorporation or by-laws.

**WHEREFORE**, plaintiff demands judgment as follows:

(a) Awarding compensatory damages or money damages against all defendants, jointly and severally, in favor of Abbott for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest from the day of the wrongs to the day of judgment herein;

(b) Declaring that the defendants, each have committed a gross abuse of trust and have breached their fiduciary duties to Abbott;

(c) Declaring that the defendants are obligated to indemnify and hold Abbott harmless from any fines, penalties, judgment, settlement or award pursuant to any of the

class actions pending or to be filed against Abbott or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

(d)     Declaring that each of the insider trading defendants be compelled to disgorge the proceeds of their trading based on inside information and that the Company recover such proceeds to prevent the defendants from being unjustly enriched by their breach of duty;

(e)     Directing that all defendants account for all damages caused by them  as a result of their unlawful conduct;

(f)     Awarding plaintiff its costs and expenses for this action, including reasonable attorneys' and experts' fees; and

(f)     Granting such other and further relief as this Court may deem just and proper.

Dated: July 16, 2007

Marvin A. Miller
Matthew E. Van Tine
**MILLER LAW LLC**
101 North Wacker Drive
Suite 2010
Chicago, IL 60606 -1913
Telephone:  312-525-8316

*Designated Local Counsel*

Deborah R. Gross
Robert P. Frutkin
**LAW OFFICES OF BERNARD M. GROSS, P.C.**
Suite 450, The Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107
Telephone:  215-561-3600

James Orman
**LAW OFFICES OF JAMES ORMAN**
1845 Walnut Street, 14th Floor
Philadelphia, PA 19103
Telephone: 215-523-7800

**Attorneys for Plaintiff**

07/13/2002 12:28 FAX 0215523390 Case 4:07-cv-03984 Document #AMES M. ORMAN Filed: 07/16/07 Page 13 of 28 PageID #:13 002/002

JUL-13-2007 11:04 AM    STANTONPHARMACY            3029990133              P.01
07/13/2002 12:00 FAX  2155239390          JAMES M. ORMAN                   002/002

## VERIFICATION

LEONARD BRONSTEIN    does hereby verify that the facts set forth in the foregoing Derivative Complaint are true and correct to the best of his knowledge, information and belief.

This statement is made subject to the penalties of perjury under the laws of the United States of America.

Date: 7/13/07          L.B. _____

13

EXHIBIT A

## Public Policy Committee Charter

1.  *Purpose.* The Public Policy Committee of the Board of Directors shall assist the Board in fulfilling its oversight responsibility with respect to: public policy, regulatory (including regulation by the Federal Food and Drug Administration, as well as other domestic, foreign and international regulatory bodies) and government affairs issues that affect Abbott (recognizing that other board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), by discharging the responsibilities set forth below.

2.  *Organization.* Abbott's Board shall appoint, and may remove, members of the Public Policy Committee and the Committee's Chairman, acting on the recommendation of Abbott's Nominations and Governance Committee.

3.  *Authority and Responsibilities.* To assist it in the conduct of its responsibilities, the Public Policy Committee shall consult with management and, to the extent it deems it necessary or appropriate, may seek advice and assistance from Abbott employees or others, and may retain legal counsel and other advisors.

    The Public Policy Committee shall report to the Board on a regular basis. The Public Policy Committee may delegate any of its responsibilities and duties to one or more members of the Public Policy Committee.

    The Committee shall:

    -   Review and evaluate Abbott's policies and practices with respect to maintaining legal and regulatory compliance (recognizing that other board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), and review them with the Board as appropriate.

    -   Devise a process for the dissemination of information to the Committee from management with respect to regulatory compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto.

    -   Review and evaluate Abbott's policies and practices with respect to social responsibility, and review them with the Board as appropriate.

- Review social, political, economic and environmental trends and public policy issues that affect or could affect Abbott's business activities, performance, and public image, and review them with the Board as appropriate.

- Review and make recommendations to the Board regarding shareholder proposals submitted for inclusion in Abbott's proxy materials that relate to public policy or social responsibility issues.

4.  *Annual Performance Review.* The Public Policy Committee shall annually evaluate its own performance.

ExHIBIT B

*b6291d*



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Food and Drug Administration

---

Dallas District
4040 North Central Expressway
Dallas, Texas 75204-3128

March 13, 2007

Ref: 2007-DAL-WL-11

<u>**WARNING LETTER**</u>

<u>**CERTIFIED MAIL**</u>
<u>**RETURNED RECEIPT REQUESTED**</u>

Mr. Miles D. White
Chairman of the Board and Chief Executive Officer
Abbott Laboratories, Inc.
100 Abbott Park Road
Abbott Park, Illinois 60064

Dear Mr. White:

During an inspection of your firm (Abbott Diagnostics Division – Dallas ADD) located at 1921 Hurd Drive, Irving, Texas 75038, from October 30 through November 17, 2006, the United States Food and Drug Administration (FDA) determined that your firm manufactures, distributes, and installs automated clinical chemistry and immunoassay analyzers for the diagnosis of diseases. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. § 321(h)), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or are intended to affect the structure or function of the body.

This inspection revealed that these devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformance with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) regulation found at Title 21, <u>Code of Federal Regulations</u> (CFR), Part 820. Your devices are also misbranded under section 502(t)(2) of the Act, 21 U.S.C. § 352(t)(2), because your firm submitted several late MDR reports.

We received your firm's responses, dated December 14, 2006, January 15, and February 14, 2007, responding to our investigators' observations noted on the Form FDA 483, List of Inspectional Observations, which was issued to your firm (copy enclosed) on November 17, 2006. At your firm's request, on January 25,

Page 2 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

2007, representatives of the FDA's Dallas District Office held a meeting with the management team from the Dallas ADD and Chicago Corporate Office to discuss your firm's quality system improvements. Your firm responded that its corrective actions are ongoing and that your firm will implement a more robust, comprehensive corrective action plan to correct compliance and quality issues globally across your product lines and update the FDA of the progress of your firm's corrective actions in subsequent progress reports. Although the Agency recognizes your firm's commitment to improving product quality and compliance with the Quality System Regulation, the Agency is not satisfied with the pace and the results of your firm's past corrective actions as they have not been effectively, timely, and globally implemented for your entire family of analyzers. The current inspection documented repeat inspectional observations in your firm's CAPA System, Production and Process Control System, and MDR reporting. Your firm responded that it is still collecting and analyzing various quality sources and conducting engineering studies to determine potential root causes of the failures of the pressure monitors and pumps in the i2000, i2000SR, and ci8200 analyzers in order to implement effective corrective actions. Abbott Laboratories must timely and effectively implement permanent and substantial actions to correct systemic noncompliant issues at its Irving, Texas manufacturing site. Your firm's responses are incomplete until your firm adequately corrects recurring inspectional observations, specific issues cited in this warning letter, and various quality issues in all of your analyzers; submits the progress reports your firm promised; and meets the Agency's requirements that call for the audits and certifications by an outside expert consultant and the certifications by your firm's Chief Executive Officer in the specific timeframes outlined in this warning letter. FDA follow-up inspections will be required to assure that corrections are adequate.

These violations include, but are not limited to, the following:

<u>Quality System Violations</u>

1. Failure of the management with executive responsibility to ensure that an adequate and effective quality system has been fully implemented and maintained at all levels of the organization, as required by 21 C.F.R. § 820.20. For example, your firm's management has not effectively implemented adequate and global corrective actions in a timely manner to correct quality issues across your analyzer product lines. The FDA's current inspection involved the issuance of an 11-item FDA-483 to your firm. Your firm made incomplete corrections as some of the current inspectional observations were repeat observations from the previous inspections of 2003 and 2004.

Page 3 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

2. Failure to establish and maintain adequate management review procedures and conduct adequate management reviews to meet the requirements of the Quality System Regulation and the manufacturer's established quality policy and objectives, as required by 21 C.F.R. § 820.22(c). Your firm's management failed to review all quality sources and take appropriate corrective actions to address various quality issues or document their adequate justification for not taking corrective actions. For example, your Dallas ADD's site management used a "dollar value" as the alert level for part replacements as a measure of malfunctions of the analyzers upon installation at their user sites to determine whether or not to further evaluate, conduct investigations, or take actions to address potential quality issues with your analyzers. If the cost of the replacement parts or "bad installs" did not exceed a "dollar" alert level, there was no investigation conducted. See your firm's Quality Metrics Report "The Installation and Performance Metrics for the c8000, i2000, i2000SR analyzers" that characterized that a number of the analyzers were found DOA (dead on arrival) upon installation in each month from 10/2004 through 9/2006.

3. Failure to establish and maintain procedures for the analysis of all sources of quality data to identify existing and potential causes of nonconforming product or other quality problems, as required by 21 C.F.R. § 820.100(a)(1), and failure to document the results of corrective action activities, as required by 21 C.F.R. § 820.100(b). For example, your firm failed to collectively analyze all sources of quality data (e.g. defective parts rejected during incoming and factory testing, defective parts rejected during initial installation of the analyzers at user sites, and defective parts replaced during service calls of the analyzers) to identify potential quality issues and their root causes at the component level or the analyzer level, and document the results of your analysis. Your firm's responses stated that your firm had not analyzed service calls for parts being replaced in the past. To remedy this situation, among the issues explained in your responses, you stated that your firm will analyze critical components at a minimum of ███ every ███████████ collect failed part returns for further evaluation, and conduct investigations into the causes of failed parts during field services of your analyzers. Your firm's responses are not adequate as your firm should conduct analyses of all quality data on a more frequent basis to timely identify quality issues and their root causes, and therefore, implement timely corrective actions. Regardless of the assigned classification for each analyzer component (e.g. critical, major, and minor parts), your firm must take appropriate actions to improve product quality (reliability) as each defective part could cause your analyzer to stop working and result in the delay of testing patient samples, transmitting patient test results to their physicians, or could cause aberrant test results.

Page 4 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

4. Failure to identify the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems, as required by 21 C.F.R. § 820.100(a)(3). For example, at the time of the inspection, your firm had not initiated and implemented adequate actions to address potential quality issues with your analyzers despite the fact that from November 2004 through October 2006, your firm received 612 worldwide complaints of pressure monitor failures, factory nonconforming reports documenting 313 pressure monitors and 308 pumps that failed factory testing, 58 out-of-box failures of the pressure monitors upon installation of analyzers at user sites, field service calls to replace these components and other components, and the DD005 Metrics Report identifying that the pressure monitors and pumps were two of the top ten defective parts. Your firm's responses concluded that your firm is still conducting additional investigations and/or analysis in order to understand the causes of the part failures.

5. Failure to establish and maintain procedures for verifying and validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished devices, as required by 21 C.F.R. § 820.100(a)(4). Your firm's DD005 Metrics Report entitled "i2000SR Arrive Alive," dated April 2005, documented that the pressure monitors were susceptible to freezing when exposed to cold temperatures and that a correction would be implemented with Software Version ███ This information was not elaborated further in the subsequent September 2006, DD005 Metrics Report or was not included in your firm's responses to verify the effectiveness of this software change. Additionally, your responses indicated that the majority of the factory failures of the pressure monitors ███%) were due to "erratic/no results" and the other failures (███%) were due to "aspiration errors" and that your firm did not investigate each failure individually. Regarding the pumps, your firm's responses confirmed that the majority of their factory failures and field replacements were due to motor step loss errors but that their failure causes were not well understood. In short, your firm's action which was to simply replace malfunctioned pressure monitors and pumps, or any other defective components during factory testing, site installation, and subsequent service calls of analyzers, is not an effective solution, and cannot be effectively verified nor validated without investigating all possible hardware and software fault conditions occurring during factory testing and field clinical use of the analyzers.

6. Failure to establish and maintain adequate procedures for finished device acceptance to ensure that each production run, lot, or batch of finished devices meets acceptance criteria prior to releasing the devices for distribution, as required by 21 C.F.R. § 820.80(d). Your factory testing failed

Page 5 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

to adequately detect and reject defective device components, including the pressure monitors and pumps, and nonconforming device functions prior to releasing the analyzers for site installation. According to your firm's DD005 Metrics Report for the period of November 2004 through October 2006, many analyzers were characterized as "bad installs" at the user sites and their components had to be replaced. For example, this report stated that in April 2005, out of the ███ installations of the i2000SR analyzers, ███ analyzers were "Dead On Arrival" and that the "Arrive Alive" percentage was 76%.

7. Failure to establish and maintain adequate procedures to ensure that all purchased or otherwise received product and services conform to specified requirements, and to include evaluation of suppliers, contractors, and consultants, as required by 21 C.F.R. § 820.50. For example, your firm rejected defective components during incoming and finished device testing, documented nonconforming material reports for rejected components, and then sent supplier corrective action reports to your suppliers to notify them of quality issues. However, your firm failed to collectively use these sources of information to re-evaluate the overall quality rating of your suppliers as required by your procedures. Additionally, despite the fact that your firm documented negative quality data for the pressure monitors and pumps, your firm has not adequately evaluated the ability of the two suppliers to meet your firm's requirements.

8. Failure to establish and maintain adequate procedures for acceptance or rejection of incoming product, and for documenting the results of acceptance or rejection, as required by 21 C.F.R. § 820.80(b). For example, your Inspection Quality Assurance (IQA) unit did not follow your firm's inspection procedures in that your IQA staff used incorrect sampling plans, released components that failed acceptance criteria for production without documenting adequate justification, and did not completely document the types of inspection and secondary checks by peer review.

9. Failure to establish and maintain adequate procedures for review and disposition of nonconforming product, and for documenting adequate justification for use of nonconforming product, as required by 21 C.F.R. § 820.90(b)(2). Your firm allowed the production use of components that did not meet your approved specifications. Your firm simply documented "the impact assessment rating is low per procedure S05.015" without providing adequate narrative details to justify the risk for using nonconforming product. For example, defective pumps were returned to your supplier for reprocessing or repair and sent back to your firm for use. During your factory testing, the motors of the reprocessed pumps were found to be ceased. Your firm nether

Page 6 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

adequately documented any adverse effect of the ████████████ of the
reagents in the pumps when these pumps were replaced during field service
calls and returned to their supplier for reprocessing nor evaluated the
reliability of reprocessed pumps for reuses. See Supplier Corrective Action
Report (SCAR) and Exception Report (ER) Report 168285.

## Medical Device Reporting (MDR) Violation

The inspection also revealed that your devices are also misbranded under
Section 502(t)(2) of the Act, 21 U.S.C. § 352(t)(2), in that your firm failed to
furnish any material or information respecting the devices that is required by or
under Section 519 of the Act, 21 U.S.C. § 360i, and 21 C.F.R. Part 803 –
Medical Device Reporting (MDR) regulation. For example, your firm submitted to
FDA several MDR reports that exceeded the 30-day timeframe of becoming
aware of medical adverse events.

## Audit Certifications

We are requesting that you submit to this office on the schedule below,
certification by an outside expert consultant that he/she has conducted an audit
of your establishment's manufacturing and quality assurance systems relative to
the requirements of the device's QS regulation (21 C.F.R. Part 820) and the
MDR regulations (21 C.F.R. Part 803). You should also submit a copy of the
consultant's report, and certification by the establishment's Chief Executive
Officer (if other than yourself) that he or she has reviewed the consultant's report
and that the establishment has initiated or completed all corrections called for in
the report. The initial certifications of audit and corrections and subsequent
certifications of updated audits and corrections should be submitted to this office
by the following dates:

- Initial certifications by consultant and the establishment's Chief Executive
  Officer are due on August 15, 2007, approximately six months after
  issuance of this warning letter.

- Next certifications by consultant and the establishment's Chief Executive
  Officer are due in May of 2008 and 2009. FDA may conduct follow-up
  inspections any time between August 2007 and May 2009.

## Response to the Warning Letter

You should take prompt action to correct the violations addressed in this letter.
Failure to promptly correct these violations may result in regulatory action being

Page 7 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

initiated by the FDA without further notice. These actions include, but are not limited to, seizure, injunction, and/or civil penalties. Also, federal agencies are advised of the issuance of all Warning Letters about devices so that they may take this information into account when considering the award of contracts. Additionally, premarket approval applications for Class III devices to which the QS regulation deviations are reasonably related will not be approved until the violations have been corrected. Requests for Certificates to Foreign Governments will not be granted until the violations related to the subject devices have been corrected.

Please notify this office in writing within fifteen (15) working days from the date you receive this letter of the specific steps you have taken to correct the noted violations, including an explanation of how you plan to prevent these violations, or similar violations, from occurring again. Include documentation of the corrective action you have taken. If your planned corrections will occur over time, please include a timetable for implementation of these corrections. If the corrective action cannot be completed within 15 working days, state the reason for the delay and the time within which the corrections will be completed.

Your response should be sent to Thao Ta, Compliance Officer, DAL-DO, Food and Drug Administration, HFR-SW140, 4040 N. Central Expressway, Suite 300, Dallas, TX 75240. If you have any questions about the contents of this letter, please contact Mr. Ta at 214-253-5217.

Finally, you should know that this letter is not intended to be an all-inclusive list of the violations at your facility. It is your responsibility to ensure compliance with applicable laws and regulations administered by FDA. The specific violations noted in this letter and in the Form FDA-483 issued at the closeout of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems. You should investigate and determine the causes of the violations, and take prompt actions to correct the violations and to bring your products into compliance.

Sincerely,

Michael A. Chappell
Dallas District Director

MAC:txt

Page 8 – Mr. Miles D. White
Abbott Laboratories, Inc.
March 13, 2007

cc:
Mr. Jeff Binder, Division President
Abbott Laboratories, Inc.
Abbott Diagnostics Division (ADD)
100 Abbott Park Road
Abbott Park, Illinois 60064

Mr. Ken M. Partyka, Site Director
Abbott Laboratories, Inc.
Abbott Diagnostics Division (ADD)
P.O. Box 152020
1921 Hurd Drive
Irving, Texas 75038

EXHIBIT C



FOR IMMEDIATE RELEASE

CIV

TUESDAY, NOVEMBER 2, 1999

(202) 514-2007

WWW.USDOJ.GOV

TDD (202) 514-1888

### ABBOTT LABORATORIES TO REMEDY DEFICIENCIES
### IN MEDICAL DIAGNOSTIC DEVICES AND PAY $100 MILLION

WASHINGTON, D.C. -- Abbott Laboratories, an Illinois-based drug and medical device manufacturer, has accepted the terms of an injunction that requires the company to take measures to comply with Food and Drug Administration (FDA) regulations and pay $100 million of expected profits to the United States to resolve allegations that the company's methods and facilities for manufacturing in vitro diagnostic devices are not in compliance with FDA good manufacturing requirements, the Department of Justice announced today.

The in vitro devices are used to diagnose diseases and other conditions, including heart conditions, drug overdoses, and pregnancy.

Acting Assistant Attorney General David W. Ogden of the Civil Division said the settlement resolves allegations that Abbott had failed over several years to implement and maintain procedures required by FDA's Quality System Regulation for medical devices. This reduced the assurance that Abbott's in vitro diagnostic devices can be relied upon to perform consistently and accurately. Abbott, as well as the company's chief executive officer, Miles D. White, and the president of Abbott's Diagnostics Division, Thomas D. Brown, agreed to be bound by an injunction requiring that specific remedial measures be taken to ensure that Abbott comes into compliance with FDA's regulation.

Under the terms of the injunction, which was entered today by U.S. District Judge Harry D. Leinenweber, Abbott will be required to cease manufacturing and distributing almost 300 in vitro diagnostic devices at two Abbott facilities in Illinois. The company cannot resume marketing these devices until an independent expert certifies to FDA, and FDA concurs in the expert's assessment, that Abbott has brought its operations into compliance with FDA's regulation. For at least four years after Abbott achieves compliance, the company must conduct regular audits of its operations and make reports to FDA concerning its continuing compliance.

The injunction makes special provision for certain Abbott devices that FDA believes are medically necessary, and thus should remain on the market in the interest of the public health. Abbott will continue to produce and distribute approximately 50 such devices while it works to achieve compliance with FDA's quality requirements for these devices, but will give up a portion of its expected profits from these devices by paying the government an equitable monetary settlement of $100 million.

Abbott also must make additional payments if it fails to bring these medically necessary products into compliance within a time-frame set by FDA. The medically necessary products include tests for AIDS, hepatitis, and other critical conditions. Such tests are already subjected to lot release by FDA as an additional control, and there is no evidence that they have been ineffective.

The settlement, and the government's complaint, were filed today in U.S. District Court for the Northern District of Illinois in Chicago. The settlement was negotiated by the Department of Justice's Civil Division, Office of Consumer Litigation, and the Food and Drug Administration's Office of Chief Counsel, Center For Devices and Radiological Health, and Center for Biologics Evaluation and Research.

#### 

99-522